## SWORN STATEMENT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, William R. Lane, being duly sworn, hereby state and depose:

## EXECUTIVE SUMMARY

1.     I am a Special Agent (SA) of the United States Fish and Wildlife Service (USFWS) and have been employed there since April 2023. I am currently assigned to the Office of Law Enforcement (OLE) in Lander, Wyoming, where my primary area of responsibility is investigating violations of federal wildlife law.

2.     The information contained within this sworn statement is based upon interviews conducted by myself and by other law enforcement officers and investigators; my personal knowledge and observations; my training and experience; and my review of reports, documents, and records.

3.     Because this sworn statement is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known concerning this investigation, but I have set forth only those facts I believe are necessary for establishing probable cause that evidence exists relating to a violation of federal law, specifically a violation of Title 16 U.S.C. §§ 703 [Migratory Bird Treaty Act], and 18 U.S.C. §§ 922(g) [Felon in possession of a firearm].

4.     This affidavit is made in support of an application for a search warrant commanding any agent of the USFWS, OLE, with appropriate investigative and technical assistance from other federal or local law enforcement agencies or medical personnel to search and seize evidence of a violation of Title 16 U.S.C. §§ 703 [Migratory Bird Treaty Act], and 18 U.S.C. §§ 922(g) [Felon

in possession of a firearm] from the person of JORDAN ABEYTA, an enrolled Northern Arapaho Tribal Member, date of birth April 7, 1987, including biological samples, namely Deoxyribonucleic Acid (DNA) obtained by buccal swabs for the purpose of establishing ABEYTA's DNA profile.

## **PROBABLE CAUSE**

5.      JORDAN ABEYTA is an enrolled member of the Northern Arapaho Tribe (Enrollment number 281U013677) and is believed to reside at 124 North Fork Road in Fort Washakie, Wyoming. According to results obtained in a National Crime Information Center (NCIC) criminal history check, JORDAN ABEYTA has misdemeanor and felony convictions for burglary, domestic battery, and interference with a peace officer. According to his NCIC record and conversation with the state of Wyoming restitution of rights coordinator, JORDAN ABEYTA is prohibited from possessing a firearm.

6.      On February 1, 2025, I received a text message from Wind River Fish and Game (WRFG) director Arthur Lawson. Director Lawson was notifying me about reports that two males had shot swans and geese near Bull Lake Dam. From the information provided, I learned that the reporting party (RP) provided the license plate number of the suspected shooters, Wyoming license plate 10-46532. Additionally, the RP had taken several photographs of the incident. Bull Lake Dam and its surrounding areas are located on the Wind River Indian Reservation. Director Lawson requested USFWS, OLE, assistance with the investigation.

7.      On February 3, 2025, I met Director Lawson at Bull Lake Creek to collect the dead swans. I collected four swans and one duck which were in the water or on the ice of Bull Lake Creek.

8.      While gathering the deceased waterfowl, Director Lawson looked along the roadway for brass casings ejected from a gun. On the roadway west of the creek, he found several brass casings. In the vicinity of 43.2192, -109.0356, I recovered two .308 brass casings, two 9mm brass casings, and two .22LR brass casings. After later reviewing the coordinates where the brass was collected, I found the coordinates to be more accurately represented as 43.2194, -109.0368, along Bull Lake Road.

9.      On February 3, 2025, I conducted a phone interview with a member of the RP, Ron Horn. From the interview, I learned that on Saturday [February 1, 2025], Horn and Delbert Nelson went bird watching at Bull Lake Creek, arriving around 10:00 am. Driving along the creek headed towards Bull Lake, Horn observed three dead swans at about 10:45 am. Two on the other side of the open water and one floating in the river. Horn took photographs of the dead swans.



10.     The pair continued up to Bull Lake before returning to Bull Lake Creek at about 1:10 pm. Arriving where the three dead swans were located, Horn observed two additional dead swans. Looking at the swans with binoculars, Horn suspected he could see blood on them. Shortly thereafter, Horn heard a gunshot and saw the water in front of them get hit by the impact. Within the impact area, Horn saw a dead goose. Horn proceeded down the road towards the highway and saw a sedan traveling towards them. A young man, approximately ten feet off the road, was out of the vehicle and headed towards the goose. When the man saw Horn, he returned to the car before driving past him. Horn described the vehicle as a smaller sedan with two or four doors that was possibly beige in color. Additionally, he looked at the vehicle with binoculars to get the license plate, which he told Nelson.

11.     Horn took additional photographs of the dead goose and the two additional dead swans. I questioned Horn to determine if it was possible that all five swans were dead before he arrived and that he may not have seen the additional two driving in. Horn was adamant, "Absolutely sure they were alive," as he had photographed the live swans on the drive in.

12.     On February 4, 2025, I interviewed Nelson. From the interview, I learned that on February 1, 2025, Nelson had arrived at Bull Lake Road at about 10:16 am. Nelson and Horn drove along the creek. Arriving at the second lake, they saw three dead swans. Horn took several photographs of the dead swans. The pair speculated how they may have died, but Horn commented that they appeared to have been shot. The pair continued on to Bull Lake before returning to the same spot. Upon returning, Nelson heard gunshots. Looking out on the ice, Nelson saw five dead swans, not three like before.

13.     As Nelson drove around the corner, he saw the front end of a car and then heard another gunshot. He believes this is when a goose was shot. After the shot, a male exited the vehicle and headed toward the goose. The male saw Nelson and returned to his vehicle. Nelson wrote down the vehicle's license plate on a receipt, [10] 46532. He described the vehicle as a lighter color, maybe tan or beige car. I questioned Nelson to determine if it was possible that all five swans were dead before he arrived and that he may not have seen the additional two driving in. Nelson stated they were looking "pretty carefully" and their carcasses were near the original three dead swans. Nelson was confident the two dead swans were not there when they drove in. I asked Nelson if there

5

was anyone else in the immediate area who may have fired the shot he saw. Nelson was confident there was not.

14.     On February 6, 2025, I interviewed JORDAN ABEYTA. Arriving at the residence, I observed a lighter-colored Subaru Outback in the driveway bearing Wyoming license plate 10-46532, the same license plate provided by the reporting party. From the interview, I learned that on February 1, 2025, JORDAN ABEYTA went to the Bull Lake area with his 13-year-old son, JAROE ABEYTA, and his 12 or 13-year-old nephew Gerald REDMAN the third, who were coyote hunting. JORDAN ABEYTA was driving the juveniles in the Subaru parked in the driveway. They were the only occupants of the vehicle. The group had two or three firearms with them. Two being a .22 and a .308. No other firearms were in the car.

15.     On February 6, 2025, I interviewed Paula Redman, JAROE ABEYTA'S mother via telephone. From the interview, I learned that JORDAN ABEYTA, JAROE ABEYTA, and "third" were together near Bull Lake on February 1, 2025. Paula Redman was unaware if they had taken any firearms with them. However, Paula Redman has a .22, 9mm, and .308.

16.     On February 6, 2025, I interviewed JAROE ABEYTA over the phone with the consent of his mother, Paula Redman. From the interview, I learned that JAROE ABEYTA went coyote hunting near Bull Lake on February 1, 2025. He was in the vehicle with Gerald REDMAN III and JORDAN ABEYTA. He had a .308 rifle and a .22 with him that he had taken from his mom's car. I asked JAROE ABEYTA if any of the swans might contain a .22 or .308 bullet; JAROE ABEYTA said there was a possibility that he could have hit a swan. JAROE ABEYTA said there was one swan he hit by the duck, adding that he prayed over it. He shot the swan with a .308. The swan was shot on the far side of the open water. Paula Redman asked him if he hit any

6

other swans, JAROE ABEYTA claimed it was possible that he hit two or three. SA Lane interjected that it was unlikely he could miss and hit the other swans. JAROE ABEYTA stated, "Ok, I am going to be honest with you now, yes I did", Paula Redman asked, "you shot them all?, ok", JAROE ABEYTA answered, "yes". When asked if there might be JORDAN ABEYTA'S fingerprints on the brass, JAROE ABEYTA stated that JORDAN ABEYTA had touched his clip while there were bullets in there and he had handled the leftover ammunition.

17.    On February 16, 2025, I took the four deceased swans to the Teton Raptor Center in Wilson, Wyoming, for preliminary X-rays. Two of the swans appeared to have suspected metal fragments within their neck. Based on my training and experience, I suspected that a swan neck would be a difficult target for a 12- or 13-year-old to hit on two separate swans. Neck shots also appeared consistent with some photographs provided by the RP.



18.     On March 4, 2025, I met with Paula Redman and JAROE ABEYTA to issue JAROE ABEYTA a violation notice for taking a migratory bird. Paula Redman mentioned that JAROE ABEYTA'S statements to me over the phone may not have been accurate. I reinterviewed JAROE ABEYTA in the presence of his mother and Bureau of Indian Affairs, SA, Dartagnan Deeds. At first, JAROE ABEYTA claimed that he lied about shooting the swans and that he did not shoot any swans. After a brief discussion, his story changed, such that JAROE ABEYTA saw white birds. JORDAN ABEYTA told him they were snow geese and gave him permission to shoot them. JAROE ABEYTA claimed to have shot two, and Gerald REDMAN III shot one or two using a .22 and .308. JAROE ABEYTA estimated they killed five or six birds. I showed JAROE ABEYTA a photo of the deceased duck I recovered, and JAROE ABEYTA stated that it was the duck he shot. JAROE ABEYTA claimed that when he was aiming, he was aiming at the center of the body.

19.     I asked if the brass casings might return with fingerprints other than those of JAROE ABEYTA or Gerald REDMAN III. JAROE ABEYTA stated that JORDAN ABEYTA loaded the gun. Paula Redman asked JAROE ABEYTA if JORDAN ABEYTA shot that day. JAROE ABEYTA stated no. I responded to JAROE ABEYTA, saying, "I'll ask you that same question one more time. Did he shoot that day?" JAROE ABEYTA replied, " Well, actually, I lied, yes, he did". JAROE ABEYTA went on to explain that JORDAN ABEYTA shot at coyotes. SA Deeds asked JAROE ABEYTA, "Did your dad [JORDAN ABEYTA] shoot the swans?" JAROE ABEYTA replied, "The ducks." After a short conversation, SA Deeds asked JAROE ABEYTA, "Did your dad [JORDAN ABEYTA] shoot at the birds?" JAROE ABEYTA replied, "yes".

8

20.     The final version of the story that JAROE ABEYTA claimed to be the truth (he had also claimed other versions were the truth previously) was that all three of them shot at the birds. SA Deeds asked JAROE ABEYTA what gun JORDAN ABEYTA shot, and he said both of them. JAROE ABEYTA claimed that JORDAN ABEYTA hit approximately three of the birds. I asked about any other firearms referencing a 9mm. JAROE ABEYTA stated that he and JORDAN ABEYTA had taken a 9mm, which was also used to shoot at birds. JAROE ABEYTA added, " I think my dad might have took it [9mm] from her [Paula Redman]  car without her knowing".

21.     Based upon training and experience, I know that human blood, sweat, saliva, hair and epithelial skin cells can contain DNA. A person's DNA is unique, and it serves as a reliable indicator of identity, to a high degree of scientific certainty. Based upon training and experience, I am aware that during various types of activities where physical contact occurs between one person and another or between one person and an object, blood, sweat, hair, saliva, epithelial skin cells, or other biological materials containing DNA can be transferred from one person to another, or from one person to various objects at the scene of the activity. This biological evidence may be microscopic in size, and even if present, undetectable to the human eye; it may only be detected by trained laboratory examiners.  Even so, such evidence is often critical in tying a suspect to a crime and/or crime scene. Based upon training and experience, I believe it is likely that biological evidence to include, but not limited to, sweat, and epithelial skin cells, exists within the various evidentiary items collected in this investigation.  For the laboratory to identify contributors to the DNA profiles identified, and determine the source of any other biological evidence, laboratory examiners require known comparisons from any subjects who may have participated in the alleged crime.

9

22.     On May 13, 2025, I spoke with Paula Redman at her work in Riverton, Wyoming. She informed me that JORDAN ABEYTA was currently admitted to Warrior Spirit, a rehabilitation center in Tooele, Utah. After returning to my office, I contacted Warrior Spirit and was informed that JORDAN ABEYTA is currently located there and is expected to remain on-site for an additional 12-15 weeks.

23.     Based on the above information, I respectfully submit that there is probable cause to believe that evidence of a violation of Title 16 U.S.C. §§ 703 [Migratory Bird Treaty Act], and 18 U.S.C. §§ 922(g) [Felon in possession of a firearm], in the form of DNA, is located on the person of JORDAN ABEYTA, and hereby do request a Search Warrant be issued authorizing the collection of DNA samples from JORDAN ABEYTA.  The collection method used to obtain this DNA will be buccal swabs, which are swabs that are run along the inside of the mouth or cheek(s) and are minimally invasive.

Respectfully submitted,

/s/William Layne

_____
SA William Layne
United States Fish and Wildlife Service

Sworn to before me and signed in my presence on May 23, 2025 and/or by reliable electronic means.

_____
Hon. Daphne Oberg
United States Magistrate Judge

10